USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/21/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Y.A., individually and on behalf of her child, S.G.,

Plaintiff,

-against-

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

No. 15-cv-05790 (CM)

**MEMORANDUM DECISION AND ORDER DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Hon. Colleen McMahon, Chief Judge:

Plaintiff Y.A. ("Plaintiff") brings this action individually and on behalf of her daughter, S.G., against the New York City Department of Education ("DOE") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*. Plaintiff also asserts parallel claims under Article 89 of the New York State Education Law, the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Part 200 of Title 8 of the New York Commissioner on Education's Regulations.

The Plaintiff seeks review of a March 23, 2015 decision by the State Review Officer ("SRO"). In that decision, the SRO upheld in substantial part the findings of the Impartial Hearing Officer ("IHO"), who had concluded that the DOE developed statutorily-compliant Individualized Education Programs ("IEPs") for the 2011–2012 and 2012–2013 school years, and that any claims for the 2010–2011 school year were time-barred.

Both the IHO and the SRO denied the Plaintiff the relief she requested, and on July 23, 2013, the Plaintiff filed the instant action against the DOE in the U.S. District Court for the Southern District of New York.

Both parties have now cross-moved for summary judgment. For the reasons set forth in this Memorandum Decision and Order, both the DOE's motion for summary judgment and the Plaintiff's motion for summary judgment are granted in part and denied in part.

## STATUTORY BACKGROUND

IDEA was designed to "open the door of public education to handicapped children" by giving "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Board of Educ. of Hedrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192, 201 (1982). IDEA itself does not "guarantee any particular level of education," *Rowley*, 458 U.S. at 191, nor does it necessarily ensure "'one that provides everything that might be thought desirable by loving parents.'" *Walczak*, 142 F.3d 119, 132 (2d Cir. 1998) (quoting *Tucker v. Bay Shore Union Free Sch. Dist.*, 873 F.2d 563, 567 (2d Cir. 1989)). Rather, IDEA guarantees "an 'appropriate' education," *id.*, that allows the child the opportunity to make "meaningful" progress, *Rowley*, 458 U.S. at 192, not simply "trivial advancement," *id.* at 130 (quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1121 (2d Cir. 1997)). This free appropriate public education is known by its acronym, FAPE.

Public school districts that receive federal education funds must comply with IDEA by providing students with special education and related services that are tailored to meet the unique needs of a particular child and are reasonably calculated to enable that child to receive an educational benefit. *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 238 (2d Cir. 2015); 20 U.S.C. § 1412(a)(1)(A). To these ends, each eligible student receives an IEP that is customized to meet

that student's individual educational needs. *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 214 (2d Cir. 2014). Each IEP must include: "(1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved." *Walczak*, 142 F.3d at 122 (citing 20 U.S.C. § 1401(a)(20)).

In New York State, IEPs are developed by local Committees on Special Education ("CSEs"). *M.O.*, 793 F.3d at 239. A CSE must involve, at a minimum, the participation the following individuals: (1) the student's parents or persons in a parental relationship; (2) a regular education teacher if the student is or may be participating in the regular education environment; (3) the student's special education teacher; (4) a school psychologist, so long as the student is being considered for participation in the regular education environment; (5) a representative of the school district qualified to provide or administer or supervise special education and is knowledgeable about the curriculum and resources of the school district; and (6) someone qualified to understand and interpret the instructional implications of the evaluation results. N.Y. Educ. Law § 4402(1)(d).

This lawsuit challenges on both substantive and procedural grounds separate IEPs for the 2010–2011, 2011–2012, and 2012–2013 school years.

## FACTUAL BACKGROUND

S.G. was born in July 2005. From ages three to five, prior to entering the New York City public school system, S.G. attended Birch Family Services ("Birch"). Pl.'s Statement of Uncontested Material Facts Pursuant to Local Rule 56.1 ("Pl.'s 56.1") ¶ 6. Birch provides education, habilitation, and residential services for people with autism and developmental disabilities. Pl.'s Mem. of Law in Support of Motion for Summ. J. ("Pl.'s Br.") 2–3. S.G.'s program at Birch was specifically designed for children with autism, and Birch required S.G. to be classified as autistic before joining the program. *Id.* at 3.

The 2010–2011 School Year

S.G. entered the New York City public school system starting in the 2010–2011 school year, when S.G. was five years old. Def.'s Statement of Uncontested Material Facts Pursuant to Local Rule 56.1 ("Def.'s 56.1") ¶ 8. Upon entering the New York City public school system, S.G. was classified as a child with disabilities. Specifically, S.G. was classified as having an "Other Health Impairment," as defined in 34 C.F.R. § 300.8(c)(9). Pl.'s 56.1 ¶¶ 1–2; Def.'s Resp. to Pl.'s Statement of Uncontested Material Facts Pursuant to Local Rule 56.1 ("Def.'s Counter 56.1") ¶¶ 1–2.

The child's classification entitled her parents to receive a Notice of Procedural Rights pursuant to 20 U.S.C. § 1415(d)(1)(A). Because the Plaintiff was not a native English speaker, the Notice was to be provided in Russian unless it was "clearly infeasible." Plaintiff testified that during she did not receive a Notice—in either Russian or English—at any point during the 2010–2011 school year. Tr. 876.[1]

[1] All references to "Tr." are to the consecutively-paginated transcript of the administrative hearing before the IHO. The hearing took place on four dates: April 23, 2013, May 1, 2013, May 8, 2013, and May 16, 2013.

On or about March 17, 2010, a CSE convened to create S.G.'s first IEP. Def.'s 56.1 ¶ 1. The Plaintiff challenges the composition of the March 2010 CSE, asserting that neither a speech language pathologist nor a physical therapist was present when they should have been, Pl.'s Resp. to Def.'s Statement of Uncontested Material Facts Pursuant to Local Rule 56.1 ¶ 2. However, the DOE contends that both were present, Def.'s 56.1 ¶ 2, and both professionals appeared to approve the March 17, 2010 IEP. Ex. 3 at 2.[2]

The IEP developed at the March 17, 2010 meeting, the CSE recommended that S.G. undergo regular speech and language therapy, as well as occupational and physical therapies. The CSE also recommended that S.G. join a special class with a student-teacher-paraprofessional ratio of 12:1:1 in a District 75 specialized school. Def.'s 56.1 ¶ 3, Ex. 3. The Final Notice of Recommendation ("FNR"), dated June 1, 2010, recommended that S.G. be placed at P. 009Q, The Walter Reed School, a District 75 school. *Id.* ¶ 4, Ex. 29.

The Plaintiff visited the District 75 school on the first day of the school year and believed S.G. was too high-functioning to attend, so she quickly objected to S.G.'s school placement. Ex. QQ ¶ 13. In a handwritten response to the FNR dated September 8, 2010, Plaintiff, whose native language is Russian, wrote, in English, "I would live [sic] to have a new conference for my daughter [S.G.] as soon as possible. Child is missing valuable schooling time. Child had change [sic] since evaluation that was 7 months ago." Ex. 29.

Following the Plaintiff's letter, a CSE convened on September 27, 2010 and modified S.G.'s placement recommendation. Ex. 2A. After having spent two days at the District 75 placement, Tr. 771, S.G. was transferred to P.S. 117 J. Keld/Briarwood School in accordance with a revised FNR dated September 29, 2010. Pl.'s 56.1 ¶ 25; Def.'s 56.1 ¶ 7.

---

[2] Because the record indicates that the speech language pathologist and the physical therapist attended the March 2010 CSE, the Court will not discuss the Plaintiff's claim that their absence constituted a procedural error capable of denying S.G. a FAPE.

At P.S. 117, S.G. was placed in a 12:1:1 classroom. She was assigned all of the originally recommended related services, including occupational therapy, physical therapy, and speech and language therapy. Def's 56.1 ¶ 8; Pl.'s 56.1 ¶¶ 40–42. The Plaintiff complains that, even though S.G. was assigned occupational, speech, and physical therapies in the March 2010 and September 2010 IEPs, S.G. did not receive these related services until January 2011, over three months after starting at P.S. 117. Pl.'s 56.1 ¶ 28.

Moreover, the Plaintiff argues that the that the original and revised 2010–2011 IEPs fell short because they did not reference or take into account S.G.'s full medical history. As noted earlier, Plaintiff alleges that S.G. has been diagnosed with Autism, Attention Deficit Disorder, Developmental Delay, Not Otherwise Specified, Gastroesophageal Reflux Disease, Asthma, food allergies, Facial Paralysis, and Epilepsy. Pl.'s 56.1 at ¶ 30. Of these conditions, only facial paralysis is listed on the IEP (as is S.G.'s penicillin allergy, which does not appear to be at issue in this case). Ex. 2A. The DOE does not dispute that S.G. was eventually diagnosed with both Asthma and Epilepsy, but instead argues those conditions did not come to light until after S.G.'s IEPs were developed and so the DOE cannot be faulted for not noting them in S.G.'s IEPs. The DOE contends that the remaining diagnoses are not supported in the record.

Over all, the parties disagree about whether S.G. made significant learning progress over the course of the 2010–2011 school year. Def.'s 56.1 ¶¶ 9–12; Pl.'s Counter 56.1 ¶¶ 9–12.

The 2011–2012 School Year

A CSE convened on June 1, 2011 to create S.G.'s 2011–2012 IEP. Def.'s 56.1 ¶ 13. S.G. was again classified as having an Other Health Impairment. Ex. 5 at 1. Present at this meeting were: (1) a special education teacher; (2) a DOE representative; (3) a speech and language therapist; (4) a physical therapist; and (5) the Plaintiff. Def.'s 56.1 at ¶ 16. The Plaintiff contends

that the absence of a school psychologist constituted a procedural violation that denied S.G. a FAPE. Pl.'s Counter 56.1 ¶ 16.

The CSE again recommended a 12:1:1 special class in a community school, along with various related services: physical therapy (again two thirty-minute sessions per week), speech and language therapy (again three thirty-minute sessions per week), adaptive physical education (two times per week), and occupational therapy. Def.'s 56.1 ¶ 17, Ex. 5 at 10–11. S.G.'s occupational therapy was increased from two thirty-minute sessions per week to three thirty-minute sessions per week. Def.'s 56.1 ¶ 18; Pl.'s 56.1 ¶ 42, Ex. 5 at 11. In addition, the IEP called for S.G. to receive year-round educational and therapeutic services. Def.'s 56.1 ¶ 18, Ex. 5 at 12.

There does not seem to be a genuine dispute that S.G. received all of her related services during the 2011–2012 school year. *See* Def.'s 56.1¶ 23; Tr. 781:11–19. *Contra* Pl.'s Counter 56.1 ¶ 23. The parties do, however, dispute whether S.G. made significant learning progress in 2011–2012. Def.'s 56.1 ¶¶ 26–27; Pl.'s Counter 56.1 ¶¶ 26–27; Pl.'s 56.1 ¶ 80. This is, in part, because the Plaintiff again argues that the June 2011 IEP contains incomplete health information. Pl.'s 56.1 ¶¶ 32–33. The June 2011 IEP appears to contain no information about any of the diagnoses discussed above. Ex. 5 at 16.

The Plaintiff testified that she did not receive a Procedural Safeguards Notice at any point during the 2011–2012 school year. Tr. 876.

The 2012–2013 School Year

A CSE convened on May 24, 2012 to create S.G.'s IEP for the 2012–2013 school year. Def.'s 56.1 ¶ 29. The DOE contends that the CSE consisted of a special education teacher, a DOE representative, a speech therapist, an occupational therapist, a physical therapist, and the

Plaintiff. Def.'s 56.1 ¶ 30. The Plaintiff argues that the speech therapist, occupational therapist, and physical therapist were not present. Pl.'s Counter 56.1 ¶ 30. However, the attendance sheet for the meeting reflects that the speech therapist, occupational therapist, and physical therapist were present; and at the hearing, the speech therapist, Ms. Korpacz, testified that she attended the 2012–2013 CSE. Ex. B at 19; Tr. 71.

S.G. was again placed in a 12:1:1 classroom and was assigned the same related services as prior years, and the parties do not appear to dispute that S.G. received these services during the 2012–2013 school year. Def.'s 56.1 ¶ 37; Tr. 781:20–23.

The Plaintiff testified that she again did not receive a Procedural Safeguards Notice at any point during the 2012–2013 school year. Tr. 876–77.

*The Falling Incidents during the 2012–2013 School Year and the Epilepsy Diagnosis*

On October 24, 2012, S.G. fell backwards and struck her head. The parties dispute how and why the fall occurred. The DOE contends that S.G. fell upon returning to her desk after hanging her coat. Def.'s 56.1 ¶ 55; Pl.'s Counter 56.1 ¶ 55. S.G.'s 1:1 paraprofessional was present but was not directly next to S.G. when she fell. Tr. 738–39. S.G.'s paraprofessional testified that she allowed S.G. to walk alone to hang her coat "to promote independence." *Id.*

After S.G.'s fall on October 24, the paraprofessional brought S.G. to the nurse's office. Def.'s 56.1 ¶ 57; *see* Tr. 144, 740. S.G. had pain and redness on her head but was alert and able to speak. Tr. 118. The nurse applied ice to S.G.'s head and notified the Plaintiff of S.G.'s fall by telephone. Tr. 118. The paraprofessional and S.G. then returned to the classroom. Tr. 119.

Later that same day, S.G. fell again while playing a game of Simon Says. Def.'s 56.1 ¶ 66; Pl.'s 56.1 ¶ 84, Ex. 39. The DOE contends that the paraprofessional was standing next to S.G. at the time. Def.'s 56.1 ¶ 66. Plaintiff insists that this cannot be so, otherwise S.G. would

not have fallen. Pl.'s Counter 56.1 ¶ 66. After S.G. fell, a nurse came to the classroom, brought S.G. to the nurse's office, and called the Plaintiff, who took her daughter to the hospital. Def.'s 56.1 ¶¶ 66–70; Pl.'s 56.1 ¶¶ 81–85.

S.G. remained in the hospital for three days, was discharged for two days, and then returned to the hospital for three days after experiencing seizures. Ex. SS 17–19. At the hospital, doctors diagnosed S.G. with epilepsy, a seizure disorder. Tr. 162:8–163:11. The Plaintiff now asserts that S.G.'s falls at school caused S.G. to develop epilepsy. *See* Pl.'s 56.1 ¶ 88. The DOE argues simply that this Court cannot consider issues relating to S.G.'s epilepsy diagnosis because the Plaintiff failed to plead those issues in the DPC. *See* Def.'s Counter 56.1 ¶ 88.

Following S.G.'s epilepsy diagnosis, S.G. was prescribed Keppra, an anti-epileptic medication that can cause numerous side effects, including unusual behavior, muscle weakness, and fatigue. Ex. SS ¶¶ 18–19. Indeed, after S.G. began taking Keppra, S.G.'s teachers and providers noticed changes in her behavior, including increased aggression and a tendency to disrupt the classroom. Def.'s 56.1 ¶ 73; Ex. SS ¶¶ 20–21. In response, the Plaintiff requested that the DOE provide additional services to S.G., Pl.'s Br. 13, but the DOE declined because S.G.'s teachers and providers said they could redirect the new behaviors and because the disruptions subsided over time. Pl.'s 56.1 ¶¶ 50–52, 66; Def.'s 56.1 ¶¶ 74–78. Accordingly, the DOE decided not to conduct a Functional Behavioral Assessment ("FBA") and did not develop a Behavioral Intervention Plan ("BIP"). *Id.*

S.G. fell again on March 5, 2013. This time, S.G. fell on her knee and did not hit her head. Def.'s 56.1 ¶¶ 80, Ex. 26 & Ex. 27.

*Promotion in Doubt*

On February 4, 2013, the DOE sent Plaintiff a Promotion in Doubt letter which stated that S.G. was not on track to be promoted to the next grade level. Ex. 20. The Plaintiff returned the letter to the school and attached a note that read, "Do [sic] to falling in school, getting seizures and be [sic] on medication is the only reason why [S.G.] is not doing well, please do not forget that." Ex. 20. By the end of the 2012–2013 school year, however, S.G. had made enough progress to advance to the next grade level.

Administrative Proceedings

On March 18, 2013, the Plaintiff filed a Due Process Complaint ("DPC"),[3] challenging the adequacy of S.G.'s IEPs for the 2010–2011, 2011–2012, and 2012–2013 school years on numerous grounds. DPC at 2 ¶ 6 & 5 ¶ 36; Pl.'s 56.1 ¶ 111, Def.'s 56.1 ¶ 83. The Plaintiff sought leave to amend the DPC on March 21, 2013, but the request was denied. Pl.'s 56.1 ¶ 112.

A hearing was held on April 23, May 1, May 8, and May 16 of 2013. Def.'s 56.1 ¶ 86. The IHO issued her Findings of Fact and Decision on June 24, 2013 and denied all relief requested by Plaintiff. Hr'g Officer's Findings of Fact & Decision 1, June 24, 2013 ("IHO Decision"). Specifically, the IHO found that: (1) the Plaintiff's claims for the 2010–2011 school-year were brought too late and could not be adjudicated; (2) the Plaintiff did not need a Russian interpreter at the CSE meetings; (3) the student's IEPs were appropriate in each year; (4) the CSEs were properly constituted for each year; (5) there was no basis to award compensatory education services; (6) the Plaintiff "failed to substantiate a claim that the student is not progressing with the current related services;" (7) S.G. did not require an FBA or a BIP; and (8) S.G. did not require a safety plan, as she was accompanied by a 1:1 paraprofessional at all

---

[3] All references to the Due Process Complaint will reference or cite the DPC. All references to the "complaint" refer to the complaint filed in this Court.

times. The IHO also concluded that Plaintiff waived several claims argued at the hearing by failing to plead them in the DPC. *See* IHO Decision 6.

The Plaintiff appealed the IHO's decision to the New York State Education Department's Office of State Review in July 2013. Pl.'s 56.1 ¶ 157; Def.'s 56.1 ¶ 99. In addition to appealing the substance of the IHO decision, the Plaintiff argued that the IHO was biased against her, and that the IHO erroneously imposed burdens of proof on her *See* Plaintiff App. Pet'n 2.

The SRO issued a decision on March 23, 2015 which largely upheld the IHO's findings. Def.'s 56.1 ¶ 100; Pl.'s 56.1 ¶ 158. The SRO found no evidence to support the Plaintiff's allegation of bias. SRO Decision 8. Additionally, the SRO concluded that the IHO had not incorrectly allocated the burden of proof and, even if the IHO had misapplied the burden, the SRO's independent review established that the DOE offered S.G. a FAPE for school years at issue. *Id.*

The SRO did, however, recognize the possibility of procedural failings that the IHO had simply dismissed, and ordered that: (1) the DOE consider whether the parent required an interpreter for the next year's CSE meeting; (2) the DOE provide the Plaintiff with a copy of the Procedural Safeguards Notice within ten days of the decision date; and (3) the CSE team discuss the student's health needs at the next annual meeting and ensure the attendance of a school physician if appropriate. SRO Decision 13.

<u>The Instant Action</u>

Having exhausted all avenues of administrative relief, the Plaintiff filed the present action on July 23, 2015. The district court complaint asserts the following claims:

- The SRO erred in finding that the DOE provided S.G. a FAPE for the 2010–2011, 2011–2012, and 2012–2013 school years;

- The SRO erred in finding that the Plaintiff was able to meaningfully participate in the June 2011 and May 2012 CSEs without an interpreter;
- The SRO erred in finding that the improperly constituted May 2012 CSE committee did not deny S.G. a FAPE;
- The SRO employed an incorrect standard when evaluating the sufficiency of the present levels of performance included on S.G.'s IEPs from June 2011 and May 2012;
- The SRO erred in not concluding that S.G. should have been given an FBA and BIP after S.G. began taking medication for epilepsy;
- The SRO erred in finding that the implementation of the May 2012 IEP was appropriate;
- The SRO erred in finding that the speech language services were appropriate on the May 2012 IEP;
- The SRO erred in finding that the Plaintiff's claims regarding the September 2010 IEP were precluded by the statute of limitations;
- The SRO erroneously found several of Plaintiff's claims to be outside of the scope of review, including:
    - Whether S.G.'s classification was improper;
    - Whether the DOE should have conducted more evaluations of S.G.;
    - Whether the DOE failed to properly implement the IEPs with respect to S.G.'s fall and the provision of related services;
    - Whether S.G. should have been provided with a 12-month school year; and
    - Whether the Plaintiff should have been provided with parent training and counseling;
- The SRO erroneously concluded that the IHO was not biased against Plaintiff, and the SRO, himself, was biased;
- The DOE violated Section 504 of the Rehabilitation Act of 1973; and
- The DOE committed negligence by failing to supervise S.G. and prevent the falls that allegedly caused S.G.'s epilepsy diagnosis.

*See generally* Compl., No. 15-cv-05790, ECF No. 2-5, July 23, 2015 ("Compl.").

## JURISDICTION AND VENUE

This Court has jurisdiction over the Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is also proper pursuant to 20 U.S.C. § 1415(i)(2)(A) and because all parties to this action reside or are located in this judicial district, 28 U.S.C. §§ 1391(b)(l)–(b)(2).

Section 1415(f) of IDEA allows parents the opportunity to administratively present claims in "an impartial due process hearing, which shall be conducted by the State educational agency . . . as determined by State law . . . ." After exhausting administrative remedies under Sections 1415(f)–(g), *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008), a party aggrieved by the administrative findings and decision may bring a civil action in any state court of competent jurisdiction or in a district court of the United States. *See* 20 U.S.C. § 1415(i)(2)(A) (2000).

The Plaintiff has exhausted all of her administrative remedies and alleges that both she and S.G. have been injured by the findings and decision made under 20 U.S.C. § 1415(f). Therefore, the Plaintiff's claim is ripe for this Court's review.

## STANDARD OF REVIEW

The summary judgment posture in an IDEA action is unusual because the action is, in substance, "an appeal from an administrative determination, not a summary judgment motion." *See L.L. v. New York City Dep't of Educ.*, No. 15-cv-4146, 2016 WL 4535037, at *4 (S.D.N.Y. Aug. 30, 2016) (citing *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012) (internal quotation marks and brackets omitted)). "Summary judgment in this context involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions." *M.O.*, 793 F.3d at 243 (quoting *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009)) (internal quotation marks omitted). The inquiry is focused on

"whether the administrative record, together with any additional evidence, establishes that there has been compliance with the IDEA's processes and that the child's educational needs have been appropriately addressed." *D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 498 n.1 (S.D.N.Y. 2013) (internal quotation marks omitted).

The district court must make its decision in accordance with a preponderance of the evidence. *See* 20 U.S.C. § 1415(i)(2)(C)(iii). The preponderance of the evidence standard "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Rather, district courts "are expected to give due weight to [administrative] proceedings." *Walczak*, 142 F.3d at 119.

"The deference owed depends on both the quality of the opinion and the court's institutional competence." *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014). For example, district courts must be "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak*, 142 F.3d at 119 (internal citations and quotation marks omitted). On the other hand, district courts need not defer to the legal conclusions or statutory interpretations of an administrative body. *See Lillbask v. Connecticut Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005); *Mrs. B.*, 103 F.3d at 1122. In addition, an administrative judge's "determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." *C.F*, 746 F.3d at 77.

"In determining whether an IEP complies with the IDEA, courts make a two-part inquiry that is, first, procedural, and second, substantive." *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 189–90 (2d Cir. 2012).

The first inquiry is meant to determine whether the state complied with statutory procedures. "[T]he importance Congress attached to the[] procedural safeguards [in IDEA] cannot be gainsaid." *Id.* at 205. A student is denied a FAPE "if the procedural inadequacies (i) impeded the child's right to a free appropriate public education; (ii) significantly impeded the Parents' opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the Parents' child; or (iii) caused a deprivation of educational benefits." *J.C. ex rel. C.C. v. N.Y.C. Dep't of Educ.*, 2015 WL 1499389, at *14 (S.D.N.Y. Mar. 31, 2015) (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). "[M]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." *R.E.*, 694 F.3d at 190.

If a court determines that violation of procedural safeguards have not denied a student a FAPE, courts embark on second, substantive inquiry. A school district complies with IDEA's substantive requirements if a student's IEP is "reasonably calculated to enable the child to receive educational benefit[s]." *Rowley*, 458 U.S. at 206–07. Such "education [must] be provided in the least restrictive setting consistent with a child's needs," and the CSE must "be mindful of the IDEA's strong preference for 'mainstreaming,' or educating children with disabilities to the maximum extent appropriate alongside their non-disabled peers." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012) (citations and internal quotation marks omitted).

## DISCUSSION

I. Preliminary Matters

The gravamen of Plaintiff's complaint is that the DOE denied S.G. a FAPE by violating S.G.'s and Plaintiff's procedural and substantive rights within the framework of IDEA. The Plaintiff also asserts three additional causes of action, which the Court will assess as preliminary matters. These are: (1) claims relating to S.G.'s 2010–2011 IEP, which the DOE contends are time-bared; (2) a claim for negligent supervision; and (3) claims not pleaded by Plaintiff in the Due Process Complaint but affirmatively pleaded in the district court complaint.

**A. Timeliness Of The 2010–2011 IEP Claim**

Under IDEA, a parent must request a due process hearing within two years of the date the parent "knew or should have known about the alleged action that forms the basis of the complaint." 20 U.S.C. § 1415(f)(3)(C). A parent lacks the requisite knowledge where she was prevented from requesting a hearing because of "(i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or (ii) the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent." *Id.* § 1415(f)(3)(D). Thus, if either exception applies, the two-year statute of limitations is tolled.

As the statute of limitations presents a question of law, this Court may make that determination without deferring to the administrative decisionmaker's conclusions. *See R.B. ex rel. A.B. v. Dep't of Educ. of N.Y.C.*, 2011 WL 4375694, at *3 (S.D.N.Y. Sept. 16, 2011) (citing *Muller ex rel. Muller v. Comm. on Special Educ. of E. Islip Union Free Sch. Dist.*, 145 F.3d 95, 102 (2d Cir. 1998)).

Here, Plaintiff's administrative challenge was filed in March 2013. The first challenged IEP was originally promulgated on March 17, 2010 and modified on September, 27 2010. Using either date, Plaintiff's challenge to the IEP for the 2010–2011 school year was filed more than two years after the IEP was issued. Therefore, absent other facts, all claims relating to the IEP for the 2010–2011 school year would be time-barred. But other facts abound, and those facts are troubling to this Court.

The DOE wrongly withheld two categories of information from the Plaintiff: the Plaintiff never received a Procedural Safeguards Notice in English or Russian, and the Plaintiff was denied reasonable access to S.G's school records. As discussed below, each wrongful withholding is sufficient to toll the statute of limitations for raising a complaint about the 2010–2011 IEP.

*1. Notice of Procedural Rights*

IDEA unquestionably requires a school district to provide parents with a Notice of Procedural Rights once per year. 20 U.S.C. § 1415(d)(1)(A). The statute further requires that the Notice be provided in the parents' native language "unless it is clearly not feasible to do so." *Id.* The Notice is intended, in part, to provide a parent with information about presenting and resolving complaints, including the time period in which to make a complaint. *See id.* § 1415(d)(2)(E).

The DOE neglected to provide the Plaintiff with a copy of a Notice of Procedural Rights, the very document that apprises a parent of her child's educational rights regarding the special education process. This failure violated Section 1415(d)(1)(A). Furthermore, the DOE neglected to translate any Procedural Safeguards Notice into Russian, the Plaintiff's native language, in violation of Section 1415(D)(2). The DOE does not appear to dispute that the Plaintiff did not

receive a Procedural Safeguards Notice in any language, *see* Def.'s Mem. of Law in Opp'n to Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Opp'n Br.") 4; *see also* SRO Decision 10, and it does not argue that translation was clearly infeasible—a difficult argument for the DOE to make, since it enrolls thousands of students from Russian-speaking homes.

At least one court in this District held, albeit at the motion to dismiss stage, that a failure to provide due process notices in a parent's native language plausibly deprives a parent of her procedural rights under IDEA and may toll the statute of limitations period in which the parent may bring a claim for an IDEA violation. *See M.G. v. New York City Dep't of Educ.*, 15 F. Supp. 3d 296, 307 (S.D.N.Y. 2014) (citing 20 U.S.C. §§ 1415(b)(3)–(4) & (f)(3)(D)). This Court agrees and finds here that the preponderance of the evidence shows that DOE failed to provide the Plaintiff with a Notice in any language, let alone the Plaintiff's native language. The DOE had an affirmative duty to transmit to the Plaintiff a complete explanation of IDEA's procedural safeguards, written in Russian. By failing utterly to fulfill its statutory duty, the DOE withheld information from the Plaintiff within the meaning of Section 1415(f)(3)(D).

It is not sufficient for the DOE to hide behind the IHO's finding that the Plaintiff spoke English, discussed in greater detail below. The statute carves out no exception for non-native English speakers.

2. *Withholding S.G.'s School Records*

The Plaintiff also alleges that she was prevented from accessing all documents in her child's educational record in violation of IDEA. Pl.'s. Br. 29–30; Compl. ¶¶ 144, 169. IDEA expressly allows "[a]n opportunity for the parents of a child with a disability to examine all records relating to such child . . . ." 20 U.S.C. § 1415(b)(1). The Second Circuit has interpreted

this right of access to allow "reasonable" records access. *See Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768, 787 (2d Cir. 2002). The Court explained:

> "Reasonable information does not mean every last cover letter, transmittal sheet, or scrap of paper that happens to be contained in [the child's] files. Possibly it might not even cover more substantive original documents or notes if the information contained therein was substantially incorporated in reports or if plaintiff had been otherwise informed of their content.

*Id.*

Even if a parent was denied reasonable access to her child's school records, "[s]uch errors will not negate the adequacy of an IEP where the child's education has not been affected and the parents have not been deprived of meaningful participation in the process." *N.C. v. Bedford Cent. Sch. Dist.*, 300 F. App'x 11, 14 (2d Cir. 2008).

In this case, the Plaintiff's counsel complained at the outset of the hearing before the IHO that Plaintiff's counsel was provided "no information [about S.G.'s education] from the district." Tr. 30:21. The IHO responded that the information would be elicited through cross examination and "as best [she could] with the documentation that [she had]." *Id.* 39:22–40:1. But when counsel attempted to ferret out this information through cross-examination, the IHO accused her of engaging in a "fishing" expedition, *e.g.*, Tr. 275:9, and attempting to conduct "trial by sabotage," *id.* 628:25–629:1.

As the hearing wore on, it became apparent that the Plaintiff indeed lacked access to or notice of certain documents relating to S.G.'s education, *id.* 328:3–331:25, 394:6–22. The IHO asked Plaintiff's counsel to create a list of desired documents and asked that the DOE's counsel determine whether the documents on Plaintiff's list "actually exist." *Id.* 331:12–24. When Plaintiff's counsel asked the IHO to sign a subpoena requesting documents beyond those she listed, the IHO refused to sign it. *Id.* 647:23-648:12.

The Plaintiff is not quibbling about lack of access to "every last cover letter, transmittal sheet, or scrap of paper that happens to be contained in [the child's] files." *Taylor*, 313 F.3d at 787. Rather, the documents she sought—information about testing and evaluation for the 2010–2011 IEP, S.G.'s progress reports—were eminently reasonable to request in this context. Accordingly, it appears plain that the Plaintiff had a statutory right under IDEA to access to those documents. The DOE's failure to turn over those documents—and the IHO's refusal to ensure their availability—contravenes the letter and spirit of IDEA's procedural guarantee of a parent's right of access. That the IHO assured Plaintiff's counsel a full opportunity to cross-examine the DOE's witnesses does not mitigate the DOE's failure here; the Plaintiff was deprived of a right ensured by statute.[4]

For the foregoing reasons, the Court finds that the Plaintiff's claims relating to the 2010–2011 IEP are not time-barred because the two-year statute of limitations has not yet run.

**B. Negligent Supervision Claim**

The Plaintiff alleges that the DOE acted negligently in failing to supervise S.G. and allowing her to fall multiple times. *See infra* pp. 8–9; Compl. ¶¶ 181–87. The Plaintiff casts this allegation as an IDEA claim, but the allegation actually sounds in negligence law.[5] The allegation is not actionable in this Court.

Negligence claims against public entities are governed by state law. State-law negligence claims require plaintiffs to file a notice of claim on the defendant entity within ninety days of the date of the alleged act of negligence. N.Y. Educ. Law § 3813(1). The Plaintiff does not dispute

---

[4] It also appears that an administrative official recognized the Plaintiff's right to access her child's educational records; a pre-hearing order required the DOE to disclose "all student documents" to the Plaintiff. Pet'r's Post-Hr'g Br. 5, 10, June 7, 2013. Why administrators failed to enforce or follow-up on this order is a mystery to the Court.

[5] To the extent that there is overlap between the DOE's common law liability and its statutory obligation to implement an appropriately designed IEP under IDEA, the preponderance of the evidence in this case reveals no failure on the part of the district to implement S.G.'s services in conformity with the May 2012 IEP.

that she failed to provide DOE with a notice of claim at any time. *See* Def.'s Opp'n Br. 13. Rather, the Plaintiff argues her negligence claim should survive because the DOE was on notice of its negligence because Plaintiff wrote to the DOE of "her potential negligence claim." Pl.'s Mem. of Law in Opp'n to Def.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s Opp'n Br.") 35. But the Plaintiff provides no documentation in support of this assertion, nor does the Plaintiff state that her letters to the DOE were sent within 90 days after the claim arose or within a reasonable time thereafter, as is required of a proper notice of claim.

Filing a notice of claim is a clear and mandatory condition precedent to a cause of action premised on a theory of negligence against a school district. N.Y. Educ. Law § 3813(1). The Court declines to credit the Plaintiff's unsupported assertion that the DOE had actual or constructive notice of its negligence claim. Accordingly, the Plaintiff's negligent supervision claim is dismissed with prejudice.

**C. Claims Allegedly Not Pleaded in the Due Process Complaint**

Under IDEA, "[t]he party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice . . . unless the other party agrees otherwise." 20 U.S.C. § 1415(f)(3)(B). This rule is designed to "prevent[] parents from 'sandbag[ging] the school district' by raising claims after the expiration of the resolution period." *C.F.*, 746 F.3d at 78 (second alteration in original).

Still, "the waiver rule is not to be mechanically applied," as "IDEA itself contemplates some flexibility." *Id.* The Second Circuit Court of Appeals laid out the contours of the waiver rule in *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68 (2d Cir. 2014). In that case, the Second Circuit determined that the plaintiffs provided "fair notice" to the defendant of their claim concerning the lack of availability of a proposed school site at the start date of the student's placement, because their due process complaint stated that a "specific and identifiable

placement was not timely." *Id.* at 78. The Court found that "[t]he allegation that [the defendant] had failed to provide a specific and identifiable placement in a timely manner surely encompasses the claim that the placement was not timely because the designated school site was unavailable." *Id.* The Court also provided more broadly applicable guidance. It wrote that arguments not directly raised in a DPC need not necessarily be foreclosed so long as: (1) the DPC "provided fair notice to the Department of" the argument at issue; (2) "both the IHO and SRO reached the issue on the merits, giving [the federal court] a record for review;" or (3) the argument goes to "the heart of this dispute." *Id.*

Notwithstanding Second Circuit's guidelines, courts in this Circuit continue to disagree about whether failing to raise a claim in the DPC waives that claim if and when the case is appealed to a federal district court. *See J.M. v. N.Y.C. Dep of Educ.*, 2016 WL 1092688, at *10 n.16 (S.D.N.Y. Mar. 21, 2016). In the Southern District of New York alone, "at least two courts . . . have held that a court may consider issues raised for the first time on appeal given that district courts, unlike SROs, are authorized by statute to consider new evidence when reviewing the administrative proceedings below." *B.M. v. N.Y.C. Dep't of Educ.*, 2013 WL 1972144 (S.D.N.Y. May 14, 2013) (citing cases). Another court adopted an intermediate stance, holding that in light of disagreement over the waiver rule, the court would consider an issue not pleaded in the DPC but mentioned in Plaintiff's closing statement and memorandum of law submitted to the IHO. *T.C. v. N.Y.C. Dep't of Educ.*, 2016 WL 1261137, at *16 n.23 (S.D.N.Y. Mar. 30, 2016). Nonetheless, it appears the majority of courts have held that issues not pleaded in the DPC to be outside of the scope of the district court's review. *See, e.g.*, *J.M*, 2016 WL 1092688, at *10; *A.M. ex rel. Y.N. v. N.Y.C. Dep't of Educ.*, 964 F. Supp. 3d 270, 282 (S.D.N.Y. 2013). This court adopts the majority view as modified by the principles set forth in *C.F.*

In this case, the Plaintiff argues that the DOE failed to consider S.G.'s full medical history, including S.G.'s history of autism; the DOE failed to perform proper evaluations of S.G., leading to S.G.'s misclassification as having an "Other Health Impairment" and the improper development and implementation of S.G.'s IEPs. Plaintiff additionally argues that the IEPs should have provided S.G. with schooling year-round, and that the IEPs should have also mandated parent counseling and training. The SRO concluded that the Plaintiff waived certain of these claims by failing to plead them in the DPC, SRO Decision 6,[6] and the DOE did not otherwise consent to litigate any issues that were unpleaded in the DPC, *see* Tr. 878.

The Plaintiff has raised these issues in her complaint before the district court and argues that the SRO should have substantively considered them, even though they were not pleaded in the DPC. Accordingly, this Court's task is to determine whether the preponderance of the evidence suggests that the DPC provided fair notice of the arguments at issue, both the IHO and SRO reached the issues on the merits, or the arguments go to the heart of this dispute. *See J.C.*, 2015 WL 1499389, at *14.

1. *IEP Implementation And FAPE In Light of S.G.'s Medical History And Inadequate Evaluation*

The DPC contends, in part, that the DOE failed to take into account certain of S.G.'s medical diagnoses, including attention deficit disorder, developmental delay, ailments not otherwise specified, asthma, food allergies, facial paralysis, and epilepsy. DPC ¶ 6. The DPC charges that the DOE's failure to consider these diagnoses or the medications S.G. was prescribed made S.G.'s IEPs inappropriate as developed and as implemented. *Id.*

---

[6] The Court notes that it was the IHO who originally faulted the Plaintiff for failing to plead certain facts and claims, including S.G.'s alleged autism analysis. Tr. 733:7–734:1. However, the IHO also faulted the Plaintiff for failing to amend her DPC to include unpleaded allegations and facts, Tr. 733:21, when, in fact, it was the IHO who denied Plaintiff's request to amend her DPC.

The DPC does *not* state, however, that that the DOE missed S.G.'s documented autism diagnosis or that the DOE's failure to consider these diagnoses prevented S.G. from getting the performance-level testing she needed. Nor does the DPC explicitly state the Plaintiff's belief that S.G. was misclassified as having an "Other Health Impairment."[7] Rather, Plaintiff mentioned these issues at the hearing and formally alleged these latter claims for the first time in the complaint before this Court. *See* Compl. ¶¶ 144–47; *see also* Pl.'s 56.1 ¶ 2; Def.'s 56.1 ¶¶ 1, 13, 29.

The IHO concluded that the Plaintiff waived her unpleaded claims by not including them in the DPC (which the IHO had refused to allow her to amend *see* p. 10, *supra*). IHO Decision 6. This Court disagrees because the above-noted claims logically and foreseeably flow from one another. That the DPC does not explicitly charge that S.G. was misclassified or that S.G. had autism means less to the Court than the DPC's more sweeping allegation that the DOE neglected to consider numerous health factors and diagnoses when creating S.G.'s IEPs. The Court reads those allegations broadly to mean that the IEPs contained incomplete information, leading to the IEPs to inaccurately describe "S.G.'s profile, abilities and requirements." DPC at 2 ¶ 6. Thus, when the DPC charges that the IEPs were "void," *id.* at 5 ¶ 36, the DOE was put on effective notice that S.G.'s disabilities had been incorrectly classified or, at the very least, that S.G.'s classification was inadequate.

Accordingly, the Court will consider these claims to determine whether the preponderance of the evidence suggests that they constitute a procedural violation under IDEA.

---

[7] Each of these arguments appears as standalone points in the briefing and in the SRO's decision. However, as discussed later in this section, this Court understands these issues to be inextricably linked. Accordingly, the Court examines the claims together.

2. *Parent Training And Counseling*

The Plaintiff alleges the CSEs should have recommended and the IEPs should have incorporated parent training or counseling. The Court agrees with the SRO's decision that the Plaintiff waived this issue by failing to raise it in the DPC. There is no indication in the DPC that the Plaintiff believed she should have been assigned these services, and there is nothing else that would remotely put the DOE on notice that Plaintiff would raise this claim.[8]

3. *12-Month School Year*

The Plaintiff has also waived claims relating to her assertion that S.G. should have received year-round schooling in the 2010–2011, 2011–2012, and 2012–2013 school years. The DPC contains no reference to a 12-month placement, and the DPC does not insinuate that the current placement length was inadequate by stating that S.G. experienced regression during the summer months.[9] This claim is therefore dismissed.

II. Procedural Violations

Having narrowed the issues for substantive review, the Court will now examine the Plaintiff's allegations that the DOE committed a number of procedural errors in connection with its handling of S.G.'s education. These alleged errors include: (1) the failure to provide the Plaintiff with Russian language interpretation or translation services; (2) the failure to provide the Plaintiff with a Notice of Procedural rights in her native language; (3) the failure to provide the Plaintiff with documents related to S.G.'s education record; (4) the failure to consider S.G.'s diagnosis of autism and other health issues; (5) the failure to conduct an FBA or BIP; and (6) the

---

[8] The only mention of "counseling" is in the context of "individual counseling" for S.G., not the Plaintiff. DPC at 7.

[9] The Court notes that the reference to "regression" in paragraph 37 of the DPC does not appear to relate specifically to regression due to lack of summer services.

failure to ensure the attendance of a school psychologist or a general education teacher at S.G.'s May 29, 2012 CSE.

"Procedural violations will entitle parents to [relief] only if they "impeded the child's right to a [FAPE]," "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child," or "caused a deprivation of educational benefits." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 160 (2d Cir. 2014) (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). The Court will examine each alleged procedural violation individually in the subsections that follow. The Court will also consider the cumulative effect of multiple procedural violations because, together, those violations may result in the denial of a FAPE even if individual violations do not. *See R.E.*, 694 F.3d at 190.

**A. Lack Of Russian Translation And Interpretation**

The DOE contends that the Plaintiff speaks and reads English, so even if her native language is Russian, she was not disadvantaged when the CSEs were conducted in English. Plaintiff denies that she speaks and reads English well.

The DOE urges this Court to treat this inquiry as a question of the Plaintiff's credibility. Under the credibility framework, the Court would defer to the IHO, who was present for the Plaintiff's testimony (which, I note, was delivered in Russian via an interpreter).

The Court believes, however, that this case calls for more than a credibility determination. Instead, the issue is whether there is enough evidence in the record to indicate that the Plaintiff was denied her right to meaningfully participate in the process that determined her daughter's special education plans.

This Court is no less competent than administrative judges in making findings as to a party's facility with language, and the determination of a parent's fluency in English does not encroach upon an area of education policy that is best handled administratively. *See J.R. v. Bd. of Educ. of City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 398 (S.D.N.Y. 2004).

After reviewing the record, it is clear that the Plaintiff speaks and writes some English and has made an effort to learn English. However, it is also clear that the Plaintiff is a non-native English speaker who struggles to speak and write in English. Indeed, the cumulative record supports the Plaintiff's claim that she required Russian translation and interpretation in order to effectively understand and to be understood. The Plaintiff testified in Russian at the impartial hearing. She testified that it is easier for her to speak Russian than English, and that she always needs a translator. Tr. 695. She also testified that she informed the DOE at every meeting that she needed a Russian interpreter. *Id.* Additionally, Plaintiff stated that her English language skills were such that she wrote her affidavit for the IHO in Russian, and used Google Translate to transliterate it into English, and asked her attorney to make sense of the result. Tr. 695–96.

In addition to her testimony, Plaintiff's written communications in the record demonstrate that her English is far from fluent. In Plaintiff's her handwritten response to the FNR, she wrote: "I would live [sic] to have a new conference for my daughter [S.G.] as soon as possible. Child is missing valuable schooling time. Child had change [sic] since evaluation that was 7 months ago." Ex. 29. And the note that Plaintiff wrote to the DOE protesting her child's original IEP for the 2010–2011 school year (the March 2010 IEP) does not demonstrate any great facility in English: it says, "Do [sic] to falling in school, getting seizures and be on medication is the only reason why [S.G.] is not doing well, please do not forget that." Ex. 20.

And although the SRO upheld the IHO's finding that the Plaintiff spoke English, the SRO was aware of the Plaintiff's discomfort with the English language and the fact that the IHO had allowed the Plaintiff to testify through an interpreter. SRO Decision 9. The SRO was concerned enough to order the DOE to consider whether the Plaintiff required an interpreter for the next CSE meeting, *see id.* at 13.

Like SRO, this Court is also troubled by the DOE's unresponsiveness to Plaintiff's language barrier. Unlike the SRO, however, this Court declines to excuse as harmless error the DOE's blind-eye approach to the Plaintiff's language barrier. Accordingly, the Court holds that the DOE's failure to accommodate the Plaintiff in Russian significantly impeded the Plaintiff's opportunity to participate in the decision-making process regarding the provision of a FAPE to S.G. *See J.C.*, 2015 WL 1499389, at *14.

**B. Failure To Provide Notices Of Procedural Rights**

Having found *supra*, that claims relating to the 2010–2011 school year are not time-barred, the Court will now address whether and to what extent the DOE's failure to provide a due process Notice in Russian for the 2010–2011, 2011–2012, and 2012–2013 school years violated the Plaintiff's procedural rights under IDEA.

As noted in Part I.A.1, *supra*, federal law required the DOE to provide the Plaintiff a Notice of Procedural Rights. Moreover, it was required to provide the Notice in Russian unless it was "clearly infeasible" to do so. As noted above, the DOE does not argue that it was clearly infeasible to provide a Notice to the Plaintiff in Russian, *see* Def.'s Opp'n Br. 4; *see also* SRO Decision 10. The DOE instead argues feebly that the Plaintiff waived her right to receive a Notice in the Russian language, because, during the CSE process in 2010–2011, the Plaintiff

communicated in English and neither asked about, nor complained of the lack of a Russian interpreter. Def.'s Opp'n Br. 3–4.

In making this argument, the DOE would have this Court create an additional exception to IDEA's very plain requirement that a parent receive a Notice in her native language unless it is clearly infeasible to do so. The Court declines to rewrite the statute; it says what it says. The Plaintiff was entitled to a Notice of Procedural Rights every year, in Russian. She never received one—not the first year, not in any year.

IDEA does not dispense with its Notice requirement when a parent appears to know some English. Rather, it requires the Notice to be provided in the parent's native language *unless it is clearly not feasible to do so*. The DOE committed a clear procedural violation each time it neglected to provide the Plaintiff with a Russian-language Notice for the 2010–2011, 2011–2012, and 2012–2013 school years.

The DOE's failure to provide the Plaintiff with a Russian-language Notice was more than a technical statutory violation. It meant that the Plaintiff was not effectively apprised of her right to have translation services at the CSE meetings, and it meant that she was not given effective notice of the time limits to bring certain causes of action relating to S.G.'s IEPs. In other words, the injury to the Plaintiff is not simply that she was deprived the ability to assert her rights, but additionally, that she was denied the ability to understand her rights or meaningfully participate in the IEP process. Accordingly, the DOE's procedural violation amounted to a denial of FAPE.

### C. Failure to Provide Plaintiff with All Documents Related To S.G.'s Education Record

As discussed above in Part I.A.2, *supra*, the DOE denied Plaintiff reasonable access to S.G.'s educational record. The Court has held that this omission tolled the statute of limitations for what may have otherwise been time-barred claims relating to the 2010–2011 IEP. The DOE's

failure to provide the Plaintiff with reasonable records also constitutes a procedural violation under Section 1415(b)(1). Moreover, the Court believes that the DOE's failure prejudiced the Plaintiff by significantly impeding on her opportunity to participate in the decision-making process regarding the provision of a FAPE to S.G. *See, e.g.*, Tr. 39:15–21. The Court therefore finds that this procedural violation denied S.G. a FAPE.

### D. Failure To Consider S.G.'s Diagnosis Of Autism and Other Health Issues, Leading to Inadequate Evaluations of S.G's Performance Levels and Misclassification of S.G.'s Disability

The Plaintiff urges this Court to find that the DOE erred in failing to consider S.G.'s diagnosis of autism and S.G.'s as other documented health issues. These failures allegedly led to inadequate performance-level evaluations and to the misclassification of S.G.'s disability which, in turn, meant that S.G.'s IEPs were improperly developed and implemented.[10]

S.G.'s health problems, including her autism diagnosis, were apparently memorialized in documents written by Birch officials. Pl.'s Br. 2–3. The Plaintiff contends that Birch provided the DOE with a copy of the 2008 evaluation substantiating S.G.'s autism prior to S.G.'s matriculation into the New York educational system. *Id.* The DOE contends that S.G. was under three years old at the time of the evaluation, which makes the diagnosis "very old," Tr. 716:4, and therefore, stale. *See* Def.'s Opp'n. Br. 10. The Court does not find this argument compelling because, as Plaintiff's counsel pointed out, "the diagnosis of autism does not go away." Tr. 716:14–15. Moreover, even if a medical record was established prior to a child's entering the DOE system, the DOE should consider that record as long as it is relevant to the child's educational plan and if made available to the DOE.

---

[10] These allegations appear in separate places in the briefing and in the complaint. The Court examines them in tandem because, as noted in Section I.C.1 n.5, *supra*, the Court understands them to be interconnected.

There is concerning evidence in the record that DOE personnel had actual knowledge of S.G.'s autism diagnosis, even though the DOE claims to have relied exclusively on a 2010 psychoeducational evaluation which classified S.G. as having an "Other Health Impairment." *See* Tr. 85:6–9. The Plaintiff contends that the fact of S.G.'s autism diagnosis should have been self-evident from S.G.'s participation in the autism-only Birch program. Additionally, the Plaintiff asserts that Birch's file on S.G., which referenced S.G.'s autism diagnosis, was provided to the DOE upon S.G.'s matriculation.

But perhaps most strikingly, the record shows that that a nurse retained by the district was aware of S.G.'s health issues, monitored her medications, and served as a liaison between the family and the district during that period. SRO Decision 10. The Court fails to understand why information known to a DOE nurse was not made available to the classroom teacher, or to other members of the CSE. The Court also fails to understand why administrative officials neglected to explore the extent of the DOE's knowledge about S.G.'s autism diagnosis. Administrative officials should have pursued these questions, as they are clearly relevant to the ultimate question of whether the IEPs crafted for S.G. provided her with a FAPE.

The preponderance of the evidence suggests that the IHO and SRO were remiss in failing to query whether and to what extent the DOE should have considered S.G.'s autism diagnosis and other health problems, or whether it received the 2008 Birch evaluation listing that S.G. had autism. These inquiries would have allowed the parties to ascertain the extent of the DOE's actual or constructive knowledge of S.G.'s early autism diagnosis and other health problems, and whether those health problems should have been factored into the DOE's 2010 evaluation of S.G. Failing to make these inquires denied S.G. a FAPE.

**E. Failure To Conduct An FBA Or Create a BIP**

The Plaintiff alleges that the SRO incorrectly concluded that S.G. did not require an FBA or BIP and, because S.G. did not undergo an FBA and no BIP was created for her, the IEPs developed for S.G. were inadequate. The Court disagrees and upholds the determination of the SRO.

In New York, an FBA is required for a student "whose behavior impedes his or her learning or that of others, as necessary to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disabilities." 8 NYCRR § 200.4(b)(1)(v). After DOE officials administer an FBA, officials develop a BIP that is "'based on the results of a[n] [FBA] and, at a minimum, include[] a description of the problem behavior, global and specific hypotheses as to why the problem behavior occurs and intervention strategies that include positive behavioral supports and services to address the behavior.'" *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 111–12 (2d Cir. 2016) (quoting 8 NYCRR § 200.1(mmm)). The process is meant to "ensure that the IEP's drafters have sufficient information about the student's behaviors to craft a plan that will appropriately address those behaviors." *R.E.*, 694 F.3d at 190.

Under both federal and state law, the decision not to conduct an FBA does not, by itself, constitute a procedural violation. *See C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d at 80. Indeed, "[a] school district is required to conduct an FBA only where it determines that the behavior at issue is sufficiently serious as to 'impede' the student's learning and where such an assessment is 'necessary' to ascertain the causes of the problematic behavior." *M.S. v. N.Y.C. Dep't. of Educ.*, 2 F. Supp. 3d 311, 324 (E.D.N.Y. 2013). However, the "omission of a functional behavioral assessment 'cause[s] us to take particular care to ensure that the IEP adequately addresses the child's problem behaviors,'" *id.* (quoting *M.W. ex rel. S.W. v. N.Y.C. Dep't of*

*Educ.*, 725 F.3d 131, 140 (2d Cir. 2013)), because the failure to conduct an adequate FBA may have "prevented the CSE from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all," *R.E.*, 694 F.3d at 190.

In this case, the SRO affirmed the IHO's decision that S.G. did not require an FBA or BIP because S.G.'s behavior was not sufficiently serious to warrant either measure. The SRO's conclusion was based in part on S.G.'s providers having uniformly testified that, at the time of the June 2011 and May 2012 CSE meetings, S.G. displayed no interfering behavior that could not be redirected by a provider. SRO Decision 11. The SRO further found that the a new CSE did not need to reconvene after S.G.'s behavior changed during the 2012–2013 school year because S.G.'s teacher testified that the S.G. was receptive to behavioral redirection, and, further, that S.G.'s behavior returned to normal within "a couple of weeks." *Id.* at 11 & n.11.

There is ample evidence in the record to support the DOE's decision against performing an FBA or creating a BIP for S.G. As the SRO noted, S.G.'s providers testified that S.G. did not display any interfering behaviors until the 2012–2013 school year, which began well after the March 2010, June 2011, or May 2012 CSE meetings. SRO Decision 11. Thus, it cannot be said that the CSE participants disregarded concerning behavior that, if properly considered, would have led them to conduct an FBA, or develop a BIP or IEP. *See* DPC 2 ¶ 7.

School officials conduct FBAs "to ascertain 'why the student engages in behaviors that impede learning and how the student's behavior relates to the environment.'" *M.S. v. N.Y.C. Dep't of Educ.*, 2 F. Supp. 3d at 325 (quoting 8 NYCRR § 200.1(r)). Here, the parties do not seem to genuinely dispute that S.G.'s new anti-epilepsy medication, Keppra, caused the new behavior.[11] Tr. 171, 537, 806, 821–22. And because the new behavior was a side effect of

[11] The Plaintiff at one point argues that S.G.'s behavioral changes were due to her allegedly inappropriate educational program rather than the Keppra. Pl.'s Counter 56.1 ¶ 71. Then, in her 56.1 Statement, the Plaintiff

medicine, doctors could mitigate those side effects by adjusting S.G.'s mediation dosing. Indeed, the behavioral side-effects subsided when S.G.'s doctor changed the medication dosage. Tr. 821–22.

Moreover, S.G.'s new behaviors were short-lived. Ms. Conforti, S.G.'s special education teacher for the 2012–2013 year, wrote in an affidavit that S.G.'s "non-compliance in the classroom only lasted for a couple of weeks." Ex. 36 ¶ 28. Ms. Korpacz, S.G.'s speech and language therapist for 2011–2012 and 2012–2013, testified in April 2013 that S.G.'s behavior was "a lot better than it was in 2012." Tr. 111. Ms. Pomper, S.G.'s occupational therapist for 2012–2013, testified that S.G. had not become aggressive in her presence. Tr. 194. Moreover, none of the providers testified that S.G.'s behavior routinely interfered with her learning.[12]

The record thus reflects by a preponderance of the evidence that the DOE correctly declined to administer an FBA, develop a BIP, or alter S.G.'s IEPs where S.G.'s behavior was temporary, not severe, and caused by a medication whose dosage could be, and was, adjusted appropriately.[13] The Court will therefore defer to the SRO's findings and conclusions on this claim.

---

contends that both the falls and the medication contributed to her behavioral issues, saying that S.G.'s aggressive behavior was due to "her having fallen and having hit her head so many times coupled with the new medication." Pl.'s 56.1 ¶ 93. Yet again, the Parent testified at a hearing before this Court that Keppra contributed S.G.'s behavioral changes. Despite the Parent's conflicting statements about causation, the Court will credit S.G.'s pediatrician's affidavit, which is based on medical evidence and states that Keppra may have caused these behavioral changes. Ex. S ¶¶ 20–21; Tr. 806:10–22.

[12] It should be noted that the IHO misstated the record in her finding that Ms. Gafni, the physical therapy provider, testified, "[t]he student's behavior does not interfere with her physical therapy." IHO Decision 18. In fact, Ms. Gafni testified that S.G.'s behavior has in fact interfered with her instruction, albeit a "rare minority of times." Tr. 418.

[13] The Court makes no statement as to the cause of S.G.'s epilepsy. Indeed, S.G.'s doctor testified that even she was unable to conclude that S.G.'s falling incidents caused her to develop epilepsy. Tr. 167:5–169:24.

**F. Improper Composition Of The May 2012 CSE**

The Plaintiff alleges that the DOE committed procedural violations when it failed to ensure that either a school psychologist or a regular education teacher was present at S.G.'s May 29, 2012 CSE meeting.[14] The DOE admits that neither official attended that meeting.

The IHO held that the May 2012 CSE team was properly constituted, IHO Decision 18. The SRO reversed after finding that no school psychologist was present at the CSE, but he nonetheless found that S.G. was not denied a FAPE. SRO Decision 9. The SRO also found that the lack of a regular education teacher was not a procedural violation. *Id.* The record does not provide a basis to overturn these decisions of the SRO.

New York law requires that a school psychologist participate in developing the IEP at the CSE. N.Y. Educ. Law § 4402(1)(b)(1)(a). None was present at S.G.'s CSE meeting, and this constitutes a technical violation of law. The Court therefore agrees with the SRO's determination that the DOE's failure to include a school psychologist was a procedural violation of New York law.

Additionally, IDEA requires that a regular education teacher must be present where "a child is, or may be, participating in the regular education environment," 20 U.S.C. § 1414(d)(1)(B)(ii). The Plaintiff noted for the first time in its briefing before this Court that, as of the May 2012 CSE, S.G was being considered for integrated co-teaching ("ICT") services. An ICT classroom is made up of both disabled and non-disabled students taught by a general education teacher and a special education teacher, and includes no more than twelve students with disabilities. *See* 8 N.Y.C.R.R. § 200.6(g). Because ICT involves the participation of a

---

[14] Plaintiff argues in her brief that point that "none" of S.G.'s CSE teams were properly constituted, Pl.'s Mem. at 27–28. However, there is no evidence that this broader challenge to the make-up of the CSEs was ever raised with the SRO, and the SRO certainly did not address the issue. As a result, this Court need only review claims relating to the composition about the May 2012 CSE.

general education teacher, the Plaintiff argues that a general education teacher should have been present at the May 2012 CSE.

But simply because S.G. was being considered for ICT services does not mean that she was being considered for participation in the "regular education environment." While IDEA does not define "regular education environment," it does define "special education" as "specially designed instruction," 20 U.S.C. § 1401(29). ICT appears to be "specially designed instruction" within the meaning of IDEA, and therefore, is not a "regular education environment" within the meaning of 20 U.S.C. § 1414(d)(1)(B)(ii); *see also S.F. v. New York City Dept of Educ.*, 2011 WL 5419847, at *9 (S.D.N.Y. Nov. 9, 2011) (finding that the absence of a general education teacher when discussing an ICT arrangement does not deprive the student of a FAPE because such classes are co-taught by a special education teacher and are not "mainstream" classes). Accordingly, the Court agrees with the SRO that the absence of a general education teacher at the May 2012 CSE did not constitute a procedural violation.[15]

Even if the absence of a school psychologist technically violated the letter of the law, however, not every technical violation can be said to deny a child a FAPE. A plaintiff must identify how such technical violations cause enough harm to impede the child's education or the parent's participation in the IEP process. *M.S.*, 2 F. Supp. 3d at 32; *see also M.W.*, 725 F.3d at 139–43. Such a showing has been required in cases where a plaintiff has challenged the adequacy of a CSE's composition. *See, e.g., M.M. ex rel. A.M. v. New York City Dep't of Educ. Region 9 (Dist. 2)*, 583 F. Supp. 2d 498, 505 (S.D.N.Y. 2008) ("Plaintiffs have failed to set forth any detrimental effect on the Student caused by the psychologist's absence . . . ."); *see also, e.g., E.A.M. v. New York City Dep't of Educ.*, No. 11-cv-3730, 2012 WL 4571794, at *7 (S.D.N.Y.

[15] It should also be noted that the record does not show by any measure that the Plaintiff requested regular education participation or that, based on S.G.'s history, she should have been considered for such an environment.

Sept. 29, 2012) (finding that the preponderance of the evidence does not show that the composition of the CSE team rendered the IEP inadequate where no general education teacher was present).

The Plaintiff argues that S.G. was harmed by the absence of a psychologist because that psychologist "could have determined whether evaluations were necessary." Pl.'s Reply Mem. 25. But New York law empowers school district officials *and* the student's parent to call for new evaluations or reevaluations, and it is not an exclusive function of a school psychologist. *See* 8 NYCRR § 200.4(b)(4). So while the Plaintiff testified that she asked for a new psychological evaluation at the June 2011 CSE meeting, Tr. 787–89, there is no evidence that she asked for such evaluations at the May 2012 CSE meeting, which is the meeting at issue on this appeal.

The Plaintiff fails to otherwise point to specific questions or issues that the CSE panel was unable to answer because a psychologist was absent. Instead, the Plaintiff recites the statutory standard, stating "[t]he failure to convene a properly constituted IEP meeting both infringed on the Plaintiff's right to meaningfully participate in the IEP development process and deprived the student with Autism [of] educational benefits." Pl.'s Reply Mem. 25. The Plaintiff goes on to generically explain, "[t]he psychologist was essential to explaining evaluations, programs, recommended services and answering any questions the parent had regarding the same." Pl.'s Mem. 27. But absent any suggestion that the Plaintiff or S.G. experienced prejudice or harm due to the psychologist's absence, the Court is unable to conclude that S.G. was denied a FAPE on that ground.

After reviewing the record, the Court finds that the facts do not indicate by a preponderance of the evidence that the composition of the May 2012 deprived S.G. of her right to a FAPE, significantly impeded the Plaintiff's opportunity to participate in the decision-making

process, or caused a deprivation of educational benefits. *See* 20 U.S.C. § 1415(f)(3)(E)(ii); *J.C.*, 2015 WL 1499389, at *14.

**G. Cumulative Effect**

The Court has concluded that the DOE committed procedural violations and denied S.G. a FAPE when the DOE failed to provide the Plaintiff with a Russian-language translation or interpretation at any IEP-related proceedings, when it repeatedly neglected to supply the Plaintiff with a Notice of Procedural Rights in any language, and when it and disregarded IDEA's requirement to provide reasonable documents to the Plaintiff. The DOE's failure to consider the Plaintiff's language limitations magnified the harm the Plaintiff and S.G. experienced from these violations. Both incrementally and cumulatively, the DOE's procedural violations denied S.G. a FAPE.

III. <u>Substantive Violations</u>

The Court has found that the DOE denied S.G. a FAPE on by failing to comply with certain procedural requirements of IDEA. Where these failures occurred, they reasonably affected and infected the totality of the administrative proceedings below. Having found that S.G. was denied a FAPE based on procedural violations, the Court finds it unnecessary to examine any remaining substantive challenges to the IEPs.

IV. <u>Neither the SRO Nor The IHO Was Biased Against The Plaintiff</u>

"IDEA's language, legislative history, structure, and implementing regulations all bear witness that the Act prohibits the use of biased adjudicators." *Heldman on Behalf of T.H. v. Sobol*, 962 F.2d 148, 155 (2d Cir. 1992). Inasmuch as IDEA allows parents a private right of action in federal court, the Court of appeals has recognized that "Congress . . . conferred on the parents of disabled children an enforceable legal right to an impartial hearing officer." *Id.*

In the proceedings before the SRO, the Plaintiff made various allegations of bias against the IHO. These claims included alleged bias displayed off the record, before the start of the hearing. Pl.'s Reply Mem. 33–34. However, the Plaintiff must point to evidence in the record to prove allegations of bias. The Plaintiff has not done so here.

The Plaintiff also alleged that the IHO acted in a biased manner during the hearing on the record. The SRO found that "even if the IHO was demanding of counsel for the parties and the hearing room was hot, on this record there is insufficient evidence to conclude that the IHO acted with bias or conducted the impartial hearing in a manner inconsistent with due process." SRO Decision 8. The SRO also doubted the sincerity of the Plaintiff's complaints. For example, the Plaintiff complained that one hearing lasted for nine hours and she was not permitted to take breaks, but the transcripts (recorded by a certified court reporter) indicates that the hearing, in fact, lasted from 11:35 until 5:35—a period of six hours—and does not indicate that Plaintiff's counsel asked for any breaks and was refused them. *Id.* 7–8. The transcripts also reveals that, on a different hearing date, the IHO allowed the parent to take a break, and to open the door to increase the comfort level in the room. Tr. 491, 655; SRO Decision 8, n.7. Instead, the record reflects that the IHO sustained objections from both parties, asked questions of both parties' witnesses, and accommodated both parties' schedules.

The IHO's periodic refusal to allow testimony outside of the scope of the due process complaint does not indicate bias. *See E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 434–35 (S.D.N.Y. 2010), *aff'd*, 487 F. App'x 619 (2d Cir. 2012). Nor is it compelling that the Plaintiff has tallied the number of objections sustained or raised *sua sponte* by the IHO. "It seems evident that statistics alone, no matter how computed, cannot establish extrajudicial bias. There is no authority for, and no logic in, assuming that either party to a

litigation is entitled to a certain percentage of favorable decisions." *United States v. Int'l Bus. Machs. Corp. (In re Int'l Bus. Machs. Corp.)*, 618 F.2d 923, 930 (2d Cir. 1980).

The Plaintiff also claims that the SRO was biased because he failed to consider "the IHO's violations of law and clear incidents of bias." Compl. ¶ 176. But the Court found no support in the record for the Plaintiff's argument that the IHO was biased. It follows that the SRO was not biased in failing to recognize the IHO's alleged bias.

It should also be noted that a finding of bias does necessarily follow because the court has found that the DOE committed procedural violations that denied S.G. a FAPE by preventing the Plaintiff's meaningful participation in the CSE and IEP processes. Rather, after review of the hearing transcripts and record in this case, the Court does not agree that the IHO or SRO were biased against the Plaintiff or handled this case in a manner inconsistent with due process. *See also E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 434–35 (S.D.N.Y. 2010) (failing to find that either the IHO or SRO were biased after reviewing hearing transcripts and the case record).

V. Plaintiff's Section 504 Claims Are Dismissed

Plaintiff also asserts a claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. That statute "prohibits a recipient of federal funds from discriminating against an individual with a disability solely by reason of that disability." *C.D. v. N.Y.C. Dep't of Educ.*, 2009 WL 400382 (S.D.N.Y. Feb. 11, 2009).

To prevail on a Section 504 claim, a plaintiff must show that he or she: (1) has a disability; (2) is otherwise qualified for a benefit that has been denied; and (3) he or she has been denied the benefit because of the disability. *See Weixel v. Bd. of Educ. of N.Y.C.*, 287 F.3d 138, 146–47 (2d Cir. 2002). Moreover, "something more than a mere violation of the IDEA is

necessary in order to show a violation of Section 504 in the context of educating children with disabilities, i.e., a plaintiff must demonstrate that a school district acted with bad faith or gross misjudgment." *Y.D. v. N.Y.C. Dep't of Educ.*, 2016 WL 698139, at *6 (S.D.N.Y. Feb. 19, 2016).

Plaintiff's Section 504 claims "are, in actuality, merely restatements of [her] IDEA claims." *Pinn ex rel. Steven P. v. Harrison Cent. Sch. Dist.*, 473 F. Supp. 2d 477, 484 (S.D.N.Y. 2007). And even though the Court has determined that S.G. was denied a FAPE for the 2010–2011, 2011–2012, 2012–2013 school years due to various procedural violations of IDEA, the Plaintiff has not presented evidence of the DOE's bad faith or gross misjudgment. Accordingly, the Plaintiff's Section 504 claims lack merit and are dismissed.

VI. Appropriate Relief

The Plaintiff requests reversal of the IHO and SRO decisions, and for Plaintiff's relief to be granted in its entirety. *See* Compl. 53. These related requests are GRANTED in part and DENIED in part consistent with the findings and conclusions of this Memorandum Decision and Order.

The Plaintiff also asks this Court to prescribe a Special Education program in a manner laid out in the complaint. *Id.* This request is DENIED. The Court will, however, order the DOE to re-evaluate S.G. and require a CSE to convene within ten (10) days of receiving the re-evaluation results in order to develop a new IEP for S.G.

The Plaintiff additionally requests an award of attorney's fees. *Id*; Pl.'s Br. 35. "In any action or proceeding brought under [IDEA], the court, in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i); *D.M. ex rel. G.M. v. Center Moriches Union Free Sch. Dist.*, 296 F. Supp. 2d 400, 403 (E.D.N.Y. 2003). "Proceedings" brought under IDEA include

IHO hearings. *A.R. ex rel. R.V. v. N.Y. City Dep't of Educ.*, 407 F.3d 65, 75 (2d Cir.2005); *see also* 20 U.S.C. § 1415(i)(3)(B)(i).

When considering a claim for attorney's fees made under a fee-shifting statute such as IDEA,

> a district court must ordinarily make two determinations. It must first determine whether the party seeking the award is in fact a prevailing party. If the party is a prevailing party, the court must then determine whether, under the appropriate standard, that party should be awarded attorney's fees.

*Mr. L. v. Sloan*, 449 F.3d 405, 407 (2d Cir. 2006).

"A party attains 'prevailing party' status if that party attains success on any significant issue in the litigation that achieves some of the benefit sought in bringing the litigation, and the manner of the resolution of the dispute constitutes a change in the legal relationship of the parties." *Mrs. M. v. Tri-Valley Cent. Sch. Dist.*, 363 F.Supp.2d 566, 569 (S.D.N.Y. 2002). To qualify for attorney's fees, "a party need not prevail on all issues," *Student X v. N.Y.C. Dep't of Educ.*, 07-cv-2316, 2008 WL 4890440, at *26–27 (E.D.N.Y. Oct. 30, 2008), but rather, must "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit," *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789 (1989) (internal quotations and citation omitted). "An order for the CSE to develop a new IEP that provides greater benefits than those proposed in the initial IEP is not *de minimis* relief so minor that it does not warrant attorney's fees, even when the specific placement initially sought is denied." *B.W. ex rel. K.S. v. N.Y.C. Dep't of Educ.*, 716 F. Supp. 2d 336, 348 (S.D.N.Y. 2010).

The Court finds that the Plaintiff is eligible to receive compensation for attorney's fees. Accordingly, the Plaintiff's request to file a fee application is GRANTED.

All other relief requested by the Plaintiff is DENIED.

## CONCLUSION

For the foregoing reasons, both the Plaintiff's and the DOE's motions for summary judgment are GRANTED IN PART and DENIED IN PART. The Clerk of the Court is directed to remove the motions at Docket Nos. 27 and 31 from the Court's list of pending motions.

Dated: September 21, 2016

U.S.D.J.

BY ECF TO ALL COUNSEL